PETER STIRBA (Bar No. 3118)
JEFFREY C. BRAMBLE (Bar No. 15548)
CHAD A. TENGLER (Bar No. 16172)
**STIRBA, P.C.**
215 South State Street, Suite 750
P.O. Box 810
Salt Lake City, UT 84110–0810
Telephone:  (801) 364–8300
Facsimile:  (801) 364–8355
Email:  peter@stirba.com

*Attorneys for Plaintiff Sherman G. Sorensen, M.D.*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SHERMAN G. SORENSEN, M.D., <br><br> Plaintiff, <br><br> v. <br><br> GERALD I. POLUKOFF, M.D.; ZABRISKIE LAW FIRM, LLC, a Utah limited liability company; RHOME ZABRISKIE, J.D.; FLEMING, NOLEN & JEZ, LLP, a Texas limited liability partnership; and RAND P. NOLEN, J.D., <br><br> Defendants. | **AMENDED VERIFIED COMPLAINT AND JURY DEMAND** <br><br> Case No. 2:18–cv–00067 <br><br> Judge Ted Stewart |

Plaintiff, Sherman G. Sorensen, M.D., by and through undersigned counsel, STIRBA, P.C., hereby complains, alleges, and avers against Defendants as follows:

### JURISDICTION AND VENUE

1.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367; 18 U.S.C. § 1964(c); and 28 U.S.C. § 2201.

2.      Venue in this action is proper in this Court pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391.  Defendants Gerald I. Polukoff, M.D.; Rhome Zabriskie, J.D.; and Zabriskie Law Firm, LLC, are subject to personal jurisdiction in this judicial district and either reside in or have their principal place of business in this district.  Defendants Rand P. Nolen and Fleming, Nolen & Jez, LLP, have engaged in the practice of law in this judicial district.  Furthermore, a substantial part of the events giving rise to the claims asserted herein occurred in Summit, Salt Lake, and Utah Counties, State of Utah.

## PARTIES

3.      Plaintiff Sherman G. Sorensen, M.D. ("Dr. Sorensen"), is an individual and has been at all relevant times, a resident of Summit County, State of Utah.  In 2006, Dr. Sorensen formed the Sorensen Cardiovascular Group ("SCG"), which provided cardiology services in Salt Lake City, Utah, until December 2011.

4.      Defendant Gerald I. Polukoff, M.D. ("Dr. Polukoff"), is an individual and on information and belief, has been at all relevant times, a resident of Summit County, State of Utah.

5.      Defendant Zabriskie Law Firm, LLC, is a limited liability company duly organized under the laws of the State of Utah and at all relevant times was doing business in the State of Utah.

6.      At all relevant times, Defendant Rhome Zabriskie, J.D., was an attorney with the Zabriskie Law Firm, LLC.  On information and belief, Mr. Zabriskie and Mr. Nolen have begun to initiate over 1,000 medical malpractice actions in the State of Utah as a part of a RICO enterprise alleged herein.  Mr. Zabriskie acted on behalf of himself and Zabriskie Law Firm,

LLC.  Mr. Nolen acted on behalf of himself and Fleming, Nolen & Jez, LLP.  The two law firms have a co-counsel agreement.

7.      Defendant Fleming, Nolen & Jez, LLP ("FNJ"), is a limited liability partnership duly organized under the laws of the State of Texas.

8.      At all relevant times, Defendant Rand P. Nolen, J.D., was an attorney with Fleming, Nolen & Jez, LLP.  Mr. Nolen has been admitted on a *pro hac vice* basis to practice law in the State of Utah in several court matters related to this action.

## GENERAL ALLEGATIONS

### *Factual Background*

9.      Dr. Sorensen is a duly licensed physician who has been licensed in the State of Utah since 1982.  Dr. Sorensen is a prominent cardiologist and is nationally recognized for his expertise in a medical procedures known as patent foramen ovale ("PFO") and Atrial Septal Defect ("ASD") closures.

10.     PFO is a defect in the septum (wall) between the two upper (atrial) chambers of the heart.  Specifically, the defect is an incomplete closure of the atrial septum that results in the creation of a flap or a valve-like opening in the atrial septal wall.  A PFO is frequent in everyone before birth but seals shut in about 75% of people.

11.     ASD is a similar defect in the septum between the two upper chambers of the heart. However, this defect is an abnormality in the development of the heart resulting in a hole.

12.     It is generally accepted and recognized that certain categories of adults can reduce the risk of having a stroke in undergoing the PFO or ASD procedure.  It is also prophylactic

concerning ongoing "TIA's", transient ischemic attacks.  Dr. Sorenson and others also believe the PFO procedure is beneficial to eliminate certain categories of headaches.

13.     Given his expertise, Dr. Sorensen has performed a large number of PFO and ASD closures throughout the years and provided follow-up medical care for those patients through his practice with SCG.

14.     As a result of this care, Dr. Sorensen maintained medical and billing records for each patient.

15.     Patient medical charts were generally kept in paper format and were securely stored in the SCG office.

16.     Conversely, patient billing records were maintained digitally and were stored on a series of hard drives that were housed on the SCG site.  These patient billing records contained confidential and sensitive patient information, which included:  (1) patient names, addresses, telephone numbers, and other personal identifying information; (2) patient demographic information; (3) patient insurance information including medical diagnostic and procedure codes; (4) patient charges; and (5) a summary of the care received by SCG patients. (Hereinafter "Confidential Protected Patient Information.")

17.     The Confidential Protected Patient Information is subject to the Health Insurance Portability and Accountability Act (hereinafter "HIPPA").  As such, its disclosure is regulated and is subject to federal law.  Unlawful disclosures are subject to civil and criminal penalties.

18.     A local technical support company named TecCon, Inc., performed the maintenance and periodic replacement of these hard drives for SCG, as well as general IT service.

19.     Furthermore, all work that was to be performed by TecCon on behalf of SCG had to be authorized by either Dr. Sorensen or the SCG Billing Manager.

### *The Business Relationship Between Dr. Sorensen and Dr. Polukoff*

20.     In 2009, Dr. Polukoff approached Dr. Sorensen and expressed an interest in working for SCG as a Cardiologist.

21.     Dr. Polukoff indicated that he wanted to leave the cardiology group he was working for at the time, and that he was very interested in learning PFO closure techniques.

22.     The proposition was discussed between Dr. Polukoff and Dr. Sorensen; however, Dr. Sorensen ultimately decided that he was not interested in bringing Dr. Polukoff, or any other cardiologist, onto the SCG staff at the time.

23.     In early 2011, Dr. Sorensen was appointed a professor of medicine at the University Of Utah School Of Medicine.  As a result, Dr. Sorensen decided to scale back his clinical practice, so as to allow him time to participate more in academia.

24.     Hoping to maintain the SCG practice, Dr. Sorensen reached out to several cardiologists and inquired about their interest in joining the SCG staff.

25.     Due to his prior interest, Dr. Polukoff was one of the cardiologists that Dr. Sorensen reached out to.

26.     Dr. Polukoff reaffirmed his interest in joining SCG's staff as a cardiologist and learning PFO closure techniques.

27.     As a result, Dr. Sorensen and Dr. Polukoff began to negotiate potential terms of employment with SCG.

28.     Given his intention to scale back his clinical practice, Dr. Sorensen envisioned Dr. Polukoff assuming the entirety of SCG's practice with Intermountain Healthcare, while Dr. Sorensen would maintain a limited clinical practice at St. Mark's Hospital and the University of Utah Medical Center.

29.     In June 2011, Dr. Polukoff entered into an employment agreement with SCG.

30.     Pursuant to the employment agreement, Dr. Polukoff was to provide services to SCG and to its patients through medical services, emergency/on call coverage, as well as admitting and referring patients.

31.     Under the agreement, Dr. Polukoff was not authorized to make decisions or formulate policies on behalf of SCG. He was simply, a contract employee.

32.     The employment agreement also established specific performance responsibilities that Dr. Polukoff was expected to perform.  Among those responsibilities were the following: (1) to execute and abide by the SCG Access and Confidentiality Agreement; (2) to comply with the Health Insurance Portability and Accountability Act; and (3) adhering to the SCG Compliance Policies and Procedures.

33.     Despite entering into the employment agreement in June 2011, Dr. Polukoff did not begin practicing with SCG until August 2011.

34.     During the initial months of his employment, Dr. Polukoff was training under Dr. Sorensen, learning PFO closure techniques.  Dr. Polukoff did not have privileges to perform PFO closures with either Intermountain Healthcare or Saint Mark's Hospital while employed by SCG. As a result, Dr. Polukoff did not independently handle any PFO closures at either hospital while with SCG.

35.     Because Dr. Polukoff was not providing independent medical care while with SCG, he was not given authority to access patient medical records, charts, or any of SCG's billing records.

### *Dr. Sorensen's Decision to Retire*

36.     In July 2011, Dr. Sorensen suffered and was treated for a heart attack.

37.     Though he returned to work, Dr. Sorensen made the decision, as a result of the heart attack, that he would retire in December 2011.

38.     Recognizing that he had agreed to employ Dr. Polukoff for at least one year, Dr. Sorensen approached Dr. Polukoff about his decision.

39.     In discussing his decision, Dr. Sorensen told Dr. Polukoff that he would either pay Dr. Polukoff the remaining balance of his guaranteed salary, or he would turn the SCG practice over to Dr. Polukoff.

40.     Dr. Sorensen conditioned the offer to turn over the SCG practice on Dr. Polukoff agreeing to continue to employ all support staff, as well as Dr. Polukoff assuming the lease for the office space.

41.     Dr. Polukoff indicated that he would consider the offer, but that he would need to ensure the financial viability of SCG before deciding to either accept or reject the offer.

42.     On or about October 2, 2011, Dr. Sorensen announced to the remaining SCG staff that he intended to retire in December 2011 the following context applied:

      a.  The support staff at SCG all believed that Dr. Polukoff was assuming control of the practice; and

    b.   Dr. Polukoff did not intend to acquire SCG, although he lulled Dr. Sorensen into believing that was his intent.

43.    In late October 2011 early November 2011, Dr. Sorensen was approached by several members of the SCG billing office, informing him that Dr. Polukoff was attempting to obtain their passwords so as to access SCG's billing records.  Dr. Sorensen instructed the staff members to not provide Dr. Polukoff with their passwords.  However, Dr. Sorensen did instruct his billing manager to provide Dr. Polukoff with a limited report (Aging Report) outlining SCG's accounts receivables.

44.    At no time was Dr. Polukoff authorized by Dr. Sorensen, or any other SCG staff member, to access, copy, or use patient medical records or SCG billing records.

### *The Stolen Hard Drive and Unauthorized Access to SCG Records*

45.    On May 9, 2011, TecCon installed new backup hard drives for SCG. On June 17, 2011, TecCon switched out SCG's old server for a brand new one. Over the next few weeks TecCon completely updated the IT infrastructure at SCG.

46.    On October 7, 2011, Dr. Polukoff:

    a.   Met with TecCon, without Dr. Sorensen's authorization or knowledge;

    b.   Falsely informed the TecCon technician, Scott Peacock, that he would be assuming ownership of SCG and wanted to discuss future work by TecCon;

    c.   Instructed that new backup hard drives be installed, despite the fact that new hard drives had already been installed in May 2011 and also a brand new server on June 17, 2011; and

    d.   Concealed from Dr. Sorensen the directions to install new hard drives; and

    e.   Requested to receive his own hard drive to take offsite.

47.    As a result, Dr. Polukoff was given a backup hard drive (the "Stolen Hard Drive").

48.    On October 14, 2011, Dr. Polukoff again met with TecCon without Dr. Sorensen's authorization or knowledge.  During the meeting, Dr. Polukoff instructed Mr. Peacock, to set up and provide him with remote access to SCG's billing records.  Mr. Peacock executed the request.

49.    Dr. Polukoff sent emails to Mr. Peacock about preparing the Stolen Hard Drive between October 7th and 25th, 2011 wherein Dr. Polukoff falsely stated he was authorized to access this patient information.

50.    On or about October 25, 2011, the following occurred:

    a.   Dr. Polukoff obtained the Stolen Hard Drive which contained within it the Protected and Confidential Patient Information of approximately 10,000 patients;

    b.   Mr. Peacock opened a port on the server for Dr. Polukoff to have access to the remote desktop, pursuant to Dr. Polukoff's unauthorized and concealed request;

    c.   Through this open port, Dr. Polukoff had access to everything digital at SCG, which was unauthorized and concealed from Dr. Sorensen. Dr. Polukoff falsely represented to Mr. Peacock that he had authority to access all of the information because he was assuming ownership of the practice.

51.    On November 4, 2011, Dr. Polukoff, without the knowledge or authorization of Dr. Sorensen, signed a new "TecCon Service Level Agreement" for SCG. This agreement was to redo the entire IT infrastructure at SCG even though it was recently upgraded.

52.     In early November 2011, Dr. Sorensen approached Dr. Polukoff again about his offer to turn over SCG and whether Dr. Polukoff decided to accept or reject the offer.

53.     Dr. Polukoff declined the offer to buy the practice and communicated this to Dr. Sorensen.

54.     As a result, on November 23, 2011, Dr. Polukoff and Dr. Sorensen executed an Agreement and General Release.

55.     Under the Agreement and General Release, Dr. Polukoff was paid a lump sum of $200,000, which was intended to satisfy the remaining guaranteed salary under the initial employment agreement.

56.     Additionally, the Agreement and General Release required SCG to pay a lump sum of $13,677.00 to Dr. Polukoff for the purpose of activating the tail insurance coverage on Dr. Polukoff's malpractice insurance.

57.     Under the Agreement and General Release, Dr. Polukoff agreed to not make any statements that were professionally or personally disparaging about SCG, Dr. Sorensen, or SCG employees. Also, the Agreement and General Release had a "general release" clause in that Dr. Polukoff "releases, acquits, satisfies, and forever discharges SCG from any and all actions, causes of action, claims, demands, damages, expenses…whether or not Dr. Polukoff now knows about those actions…"

58.     On or about November 16, 2011, Dr. Sorensen became aware that Dr. Polukoff had been granted remote access to SCG's billing records.  He immediately contacted TecCon and instructed them to terminate Dr. Polukoff's access.

59.     On or about December 13, 2011, while closing SCG, Dr. Sorensen was alerted by the SCG staff that a backup hard drive might be missing.  As a result, Dr. Sorensen sent an email to Dr. Polukoff, asking if he was aware of a missing hard drive.  Dr. Polukoff falsely denied any knowledge of a missing hard drive and indicated to Dr. Sorensen that he would look through his things for a hard drive, but did not respond further.

### *The Qui Tam Action*

60.     On December 6, 2012, Dr. Polukoff initiated a *qui tam* action against Dr. Sorensen, SCG, St. Mark's Hospital, Intermountain Healthcare, Intermountain Medical Center, and HCA, Inc.  The action was filed in the United States District Court for the Middle District of Tennessee, alleging fraudulent Medicare/Medicaid billing in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.*  (*See United States ex rel. Gerald Polukoff v. St. Mark's Hospital, et al.*, Case No. 3:12-cv-01277, before the Hon. Kevin Sharp, M.D. Tenn.).

61.     As *qui tam* plaintiff, Dr. Polukoff alleged that Dr. Sorensen had performed medically unnecessary PFO closures on patients and conspired with the other defendants in the *qui tam* action to improperly bill the United States Government by submitting false claims for reimbursement under Medicare and Medicaid.

62.     Prior to December 3, 2015, Dr. Polukoff delivered the Stolen Hard Drive, which was located in Utah, to Mr. Nolen and FNJ in Texas. Mr. Nolen and FNJ continue to possess the Stolen Hard Drive Mr. Nolen admitted this to Dr. Sorensen's attorneys during the *qui tam* action in a letter on Mr. Nolen's Law Firm's letterhead dated July 20, 2016.

63.     In the Amended Complaint of the *Qui Tam* action, Dr. Polukoff admits that he was in possession of the Stolen Hard Drive, Dr. Sorensen's patients' medical records, Dr.

Sorensen's notes and medical charts, confidential SCG billing documents, and other confidential information and documents.[1] Dr. Polukoff also admits that he is in possession of documents that were not contained on the Stolen Hard Drive, such as charting, notes, tests, labs, etc. Dr. Polukoff was not authorized to possess this information.

64.     Subsequently, Dr. Sorensen, SCG, and the other medical facilities moved to have the action dismissed.

65.     On April 13, 2016, the Honorable Kevin Sharp, granted a motion to dismiss the claims against HCA, Inc.  Judge Sharp found that Dr. Polukoff provided no particular allegations about when HCA would have learned about the allegedly unnecessary PFO closures or what actions HCA might have taken to perpetuate the alleged fraud.  Because Dr. Polukoff's claims rested upon "unsubstantiated speculation," the Court dismissed the claims against HCA.

66.     As to the remaining defendants, Judge Sharp reserved ruling on their motions to dismiss because the Judge found that venue was no longer proper.  As a result, Judge Sharp transferred the *qui tam* action to the United States District Court for the District of Utah.

67.     Dr. Sorensen filed a Motion to Dismiss in the United States District Court for the District of Utah on or about June 28, 2016. The other Defendants to the *qui tam* action also filed Motions to Dismiss around the same time. On July 1, 2016 Dr. Polukoff filed an Opposition to Defendants' Motions to Dismiss.

68.     On January 19, 2017, the Honorable Jill Parrish addressed three motions to dismiss, filed by Intermountain Healthcare, St. Mark's Hospital, and Dr. Sorensen respectively.

---

[1] *See Qui Tam* Amended Complaint, Case No. 3:12-cv-01277, D.E. 90, at ¶¶ 93, 117, 122, 136, 137, 141, and 143.

69.     In doing so, Judge Parrish conclusively found that Medicare and Medicaid had not issued any guidelines for when it would and would not pay for a PFO closure.  Further, Judge Parrish found that Plaintiff (Defendant in this case) admitted there are no such guidelines set by Medicare or Medicaid. Judge Parrish held that for liability to attach, the allegations had to be predicated on an objectively verifiable fact.  Judge Parrish warned that "expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false."

70.     Ultimately, Judge Parrish ruled that the allegations in Dr. Polukoff's Complaint were based on subjective medical opinions that could not be proven to be objectively false. As a result, Judge Parrish dismissed the *qui tam* action with prejudice.

### *Dr. Sorensen's Demand to Return the Stolen Hard Drive*

71.     On July 13, 2016, counsel for Dr. Sorensen sent a letter to Mr. Nolen, demanding Dr. Polukoff to return the Stolen Hard Drive, containing Protected and Confidential Patient Information , as well as any other protected health information ("PHI") that was in Dr. Polukoff's possession.  Dr. Sorensen further demanded that Dr. Polukoff, as well as his agents and attorneys, provide declarations under oath that they did not delete, modify, make, or retain copies of the Stolen Hard Drive, Protected and Confidential Patient Information, or other PHI.

72.     In a response letter dated July 20, 2016, Mr. Nolen stated the following:

> To address some of Dr. Sorensen's alleged concerns raised in your correspondence:
>
> 1. The hard-drive is presently in my firm's possession and control.
>
> 2. We do not have any copies or backups.
>
> 3. Dr. Polukoff does not have any duplicates or backups.
>
> 4. The hard-drive has not been deleted or otherwise modified by Dr. Polukoff or anyone acting on his behalf.
>
> 5. My firm has instituted standard HIPAA guidelines and has applied them to his hard-drive and its data.
>
> 6. The hard-drive was provided to the United States Department of Justice, and returned.
>
> 7. Rhome Zabriskie and the Zabriskie Law Firm, L.L.C., are co-counsel on the *qui tam* action, but have never been in possession of the encrypted hard-drive.

73.    Mr. Nolen's letter went on to state:  "Dr. Polukoff respectfully declines your client's demand to return the hard-drive and declines your demand for a declaration under oath at this time."

### *Unlawful and Unauthorized Use of the Stolen Hard Drive and Confidential Information*

74.    Mr. Nolen and FNJ admit in the *qui tam* action that they accessed the Protected and Confidential Patient Information contained on the Stolen Hard Drive to ascertain the identity of Dr. Sorensen's patients, their contact information, and the summary of medical care received by each patient. In their amended complaint, Defendants list 349 different patients and redacted information.

75.    On or about April 25, 2016, in furtherance of the scheme and artifice to defraud Mr. Nolen and FNJ entered into co-counsel agreement with Mr. Zabriskie and the Zabriskie Law Firm. Mr. Nolen and FNJ engaged in extensive electronic, as well as telephonic, communications with Mr. Zabriskie and the Zabriskie Law Firm, in an effort to coordinate and execute a

concerted plan to target and directly solicit Dr. Sorensen's former patients to participate in medical malpractice lawsuits.

76.     Using this information, in early 2016, Mr. Nolen and FNJ transmitted the Protected and Confidential Patient Information from Texas to Mr. Zabriskie and the Zabriskie Law Firm in Utah.

77.     As part of the scheme as alleged herein, Mr. Nolen, FNJ, Mr. Zabriskie, and the Zabriskie Law Firm, used the Protected and Confidential Patient Information contained on the Stolen Hard Drive to directly solicit patients of Dr. Sorensen through the US Mail.

78.     Without discovery, it cannot be known the exact number of solicitation letters, but Defendants' lawyers have already represented that 1,000 former patients have signed up and discovery will allow to determine the number of patients that did receive the letter.

79.     Each of these letters included paperwork which the former patient was asked to sign, so as to allow Mr. Nolen, FNJ, Mr. Zabriskie, and the Zabriskie Law Firm, to initiate an action against Dr. Sorensen.

80.     Furthermore, when a patient did not respond to the initial solicitation letter, Mr. Nolen, FNJ, Mr. Zabriskie, and the Zabriskie Law Firm, would send a follow-up letter, which indicated Mr. Zabriskie's continued interest in pursuing the patient's case.  Specifically, these letters stated the following (this letter was sent unsolicited to Dr. Sorensen's patient and is dated June 27, 2017):

**ZABRISKIE LAW FIRM, LLC**
www.zabrisk.com
899 North Freedom Blvd., Ste. 200
Provo, Utah 84604
Phone: (801) 375-7680
Fax: (801) 375-7686

June 27, 2017

Re:   *PFO/ASD litigation update letter*

I think you will be interested to hear that we conducted the first of what will be hundreds of hearings before the Department of Professional Licensing (DOPL). These hearings are necessary precursors to litigation in any medical negligence case in the State of Utah. In the hearing the respective parties are allowed to present the facts in their case to a panel. The panel then deliberates on the facts in the case and issues an opinion as to whether the case does or does not have merit. Although the opinion of the panel is non-binding the parties still consider the opinion to be important as it is the first objective indicator as to whether a case has merit. We have received the first opinion back on one of these hearings and the DOPL panel found that our claim against the doctor (performing an unnecessary pfo/asd closure procedure) had merit. Keep in mind that the facts in this client's case were nearly identical to the facts in your case.

Now that the panel has issued its opinion our client's case may be filed in District Court. Many more of our clients' cases are in the process of being scheduled for hearings before DOPL. What this means is that the litigation is about to rapidly accelerate.

We are still very interested in your case and would love the opportunity to represent you. If you still have the paperwork that we provided for your signature, please get it signed and returned to us as soon as possible. If you do not have that paperwork, please contact my office immediately and let us know so that we can send you new paperwork. Please act on this quickly as there are time-deadlines for filing. Also, it would be ideal if we could keep your case on pace with the others as we work these matters closer to verdict or settlement.

Kind Regards,


Attorney at Law

81.    The foregoing excerpt states that a case that was "nearly identical" factually to this patient's case, had been considered by a pre-litigation panel and was found to have merit.

82.    On information and belief, the patient to whom the letter was directed did not have any communication with Mr. Nolen, FNJ, Mr. Zabriskie, or the Zabriskie Law Firm regarding the care he received from Dr. Sorensen. Therefore, the only way Mr. Nolen, FNJ, Mr. Zabriskie, or the Zabriskie Law Firm could state that two patients' "case[s] were nearly identical" would be if the Stolen Hard Drive was accessed to view the patient's records and medical services received.

83.     In addition to the letters cited above, on September 28, 2016, a patient posted on Reddit[2] a solicitation letter from Zabriskie Law stating "[m]ore than 400 patients have joined this litigation… In cases where there are no obvious side effects we still assess a value exceeding $100,000…."

84.     To date, the following 22 patients have filed complaints against Dr. Sorensen in Utah's Third District Court:

    a.   Lisa Tapp

    b.   Lindi Sue Beaudoin

    c.   Pia Merlo-Schmucker

    d.   Johannah Bright

    e.   Joni Michelle Jensen

    f.   Megan E. Griffith

    g.   Joyce Warburton Day

    h.   Vicky E. Rodriguez

    i.   Claudia E. Hagan

    j.   Annette Leclaire

    k.   Heather J. Mammales

    l.   Jerie E. Davis

    m.   Dorothy Wiens

    n.   Wade T. Murdock

    o.   Juliann McMillan

---

[2] Reddit is an online website that allows users to view and discuss social news as well as share various posting if they wish.

p.   Melvin Stauffer

q.   Christy Pierce Dansie

r.   Suzanne Harris Tyler

s.   Jennifer Lee Calcut

t.   Brandy Payne

u.   Mary Catherine Kay; and

v.   Andrew H. Perkins

85.    Upon information and belief and in furtherance of the Defendants' scheme, Defendants used the Confidential Protected Patient Information from these 22 patients to initiate the solicitation letters to them, and as a result, they signed up to commence malpractice litigation against Dr. Sorensen. Given Defendants representations that more than 1000 patients have signed up, it is likely more complaints will be filed by patient that received the solicitation letter.

86.    In furtherance of the scheme as hereinafter more fully alleged, on May 15, 2016 Defendant Rhome Zabriskie placed the following advertisement in the Salt Lake Tribune titled "The Bernie Madoff of Heart Surgery Hits Utah Hard:"



87.     The advertisement falsely alleges the following:

a.   "The American Medical Association and the FDA indicate that in the vast majority of cases, patients are exposed to more risk with surgery than by simply leaving the hole alone";

b.   "I discovered there were terrible abuses to PFO and ASD by a local cardiologist (we'll call Dr. X)";

c.   "This deception resulted in bias with some local radiologists who began offering MRI reads skewed in favor of Dr. X's unethical PFO and ASD surgery practices";

d.   "On multiple occasions [my] source claims to have seen Dr. X deliberately punch out and enlarge otherwise clinically insignificant holes in the hearts of patients, only to close the holes by using the expensive and permanently-implanted closure devises";

e.   "According to the FDA advisory, many of Dr. X's patients are also now at risk of developing potentially fatal heart tissue erosion";

88.     Mr. Zabriskie states in this advertisement that "no third-party notifications can be sent," regarding the surgery due to laws protecting patient identity. However, regardless of this admission, solicitation letters were sent directly to patients thereby doing exactly what Mr. Zabriskie said should not be done.

89.     The following is a screen shot of the Zabriskie Law Firm's website, last visited on May 10, 2018:

## ZABRISKIE LAW FIRM

Home   Criminal Law ⌄   Auto Accident Lawyer   Defect Product Claims   Firm Overview ⌄   Request Evaluation   Case Results ⌄   Firm Blog

### The Scheme

Utah has had inordinately high numbers of patients who had PFO and ASD heart closure procedures. From 2001 to present, an estimated 10,000 procedures were performed in Utah. This represents a disproportionate number of patients having PFO closures and similar ASD (atrial septal defect) closures performed in the catheter labs of local hospitals. Recent evidence shows that many of these procedures were performed in violation of FDA and AMA standards.

A quarter of the population has a PFO or an ASD (a little hole between the upper chambers of the heart where tissue failed to fully develop). According to all leading experts, the vast majority of these holes are considered to be clinically insignificant.

The American Medical Association and the FDA indicate that in the vast majority of cases patients are exposed to more risk with surgery than by simply leaving the hole alone. Surgery is only indicated in the most extreme cases. The medical standard for



90.     The Defendants put on Zabriskie Law Firm's website "[r]ecent evidence shows that many of these procedures were performed in violation of FDA and AMA standards." As of May 8, 2018, this is still posted on the website. This information is false because prior to 2012, the time the surgeries were performed, no such standards existed.  Moreover, the FDA does not regulate the practice of medicine.

91.     In furtherance of the scheme as more fully hereinafter alleged, on June 7, 2016 Zabriskie Law Firm Facebook Page stated:



92.     On August 1, 2016 and December 19, 2016 the Zabriskie Law Firm posted very similar advertisements on its Facebook Page.

93.     The Facebook posts contain the following false statements:

a.  The offending Doctor committed "medical abuse;"

b.  The PFO and ASD heart surgery was a scheme;

c.  On all three posts, there is a link to the Zabriskie Law Firm webpage that states the false statement these surgeries violated FDA and AMA standards.

94.     In furtherance of the scheme as hereinafter alleged, the Defendants were and still are using the internet and US mail to falsely accuse Dr. Sorensen of performing unnecessary

PFO and ASD procedures[3], knowingly full well that Judge Parish fully rejected this claim in her ruling on January 1, 2017.

## FIRST CAUSE OF ACTION
### (Conduct and Participation in a RICO Enterprise through a Pattern of Racketeering Activity – 18 U.S.C. § 1962(c))

95.     Plaintiff hereby incorporates paragraphs 1 through 94 as fully set forth herein.

96.     At all relevant times, each Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), in that they are individuals and legal entities that are "capable of holding a legal or beneficial interest in property."

97.     Each Defendant has been and continues to be associated with an "enterprise" (the "Solicitation Enterprise"), as defined by 18 U.S.C. § 1961(4), in that they are individuals and legal entities, which have associated in fact.

98.     At all relevant times between October 2011 to the present, each Defendant agreed to and did conduct and/or participate, and continues to conduct and participate, either directly or indirectly, in the Solicitation Enterprise's affairs through a pattern of racketeering activity.

### *The Scheme and Artifice to Defraud*

99.     Plaintiff hereby incorporates paragraphs 36 through 98 as if fully set forth herein, which specifically alleges acts done in furtherance of the scheme and artifice to defraud.

100.    The Scheme and Artifice to Defraud included the acquisition of the Stolen Hard Drive and the use of Protected and Confidential Patient Information through trickery, falsehoods, and active concealment in violation of federal law. The information was to be used and

---

[3] In the *Qui Tam* action, Defendants admit that the FDA did not issue FDA recommendation until February 2014, well after Dr. Sorensen retired. Defendants know the statements regarding violations of FDA are false.

monetized for the Defendants financial benefit to fraudulency induce patients to file medical malpractice lawsuits and/or use the information without the knowledge or consent of the patients, in violation of federal law, to wit HIPAA, in other litigation such as the qui tam litigation.

### *Predicate Acts*

101.    Pursuant to and in furtherance of their scheme and artifice to defraud, Defendants jointly cooperated in the commission of at least six (6) or more of the RICO predicate acts that are itemized in 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of 18 U.S.C. § 1962(c) as follows:

a.   **Transportation of Stolen Goods:**

(i)   It was further a part of the scheme and artifice to defraud when Dr. Polukoff, transported, transmitted, or transferred the Stolen Hard Drive and/or its contents across state lines going from Utah to Texas.  The Stolen Hard Drive, and the data contained on it, has a value that exceeds $5,000. Furthermore, Dr. Polukoff caused the Stolen Hard Drive and/or its contents to be transported, transmitted, or transferred across state lines with knowledge that the Stolen Hard Drive was stolen, converted, or taken by fraud, in violation of 18 U.S.C. § 2314, which constitutes "racketeering activity" under 18 U.S.C. § 1961.

(ii)   It was further a part of the scheme and artifice to defraud when Mr. Nolen, transported, transmitted, or transferred the Stolen Hard Drive and/or its contents across state lines going from Texas to Utah.  The Stolen Hard Drive, and the data contained on it, has a value that exceeds $5,000.

Furthermore, Mr. Nolen caused the Stolen Hard Drive and/or its contents to be transported, transmitted, or transferred across state lines with knowledge that the Stolen Hard Drive was stolen, converted, or taken by fraud, in violation of 18 U.S.C. § 2314, which constitutes "racketeering activity" under 18 U.S.C. § 1961.

b. **Sale or receipt of Stolen Goods:**

(i)   It was further a part of the scheme and artifice to defraud when FNJ and Mr. Nolen, having knowledge that the Stolen Hard Drive, which has a value that exceeds $5,000, and its contents were either stolen, unlawfully converted, or taken, as well as having knowledge that the Stolen Hard Drive and its contents had crossed a State boundary after it was stolen, unlawfully converted, or taken, received and continue to possess stolen data from the Stolen Hard Drive in violation of 18 U.S.C. § 2315, which constitutes "racketeering activity" under 18 U.S.C. § 1961.

(ii)  It was further a part of the scheme and artifice to defraud when Mr. Zabriskie and the Zabriskie Law Firm, having knowledge that the Stolen Hard Drive and its contents were either stolen, unlawfully converted, or taken, as well as having knowledge that the Stolen Hard Drive, which has a value that exceeds $5,000, and its contents had crossed a State boundary after it was stolen, unlawfully converted, or taken, received and continue to possess stolen data from the Stolen Hard Drive in violation of 18 U.S.C. § 2315, which constitutes "racketeering activity" under 18 U.S.C. § 1961.

c. **Mail Fraud:** The Defendants engaged in a scheme and artifice to defraud in violation 18 U.S.C. § 1341 which constitutes "racketeering activity" under 18 U.S.C. § 1961, and used as instrumentalities of their scheme the United States Mail.

d. **Wire Fraud:** The Defendants engaged in a scheme and artifice to defraud in violation 18 U.S.C. § 1343 which constitutes "racketeering activity" under 18 U.S.C. § 1961, and used as instrumentalities of their scheme the internet, telephone, and other means of communication.

### *Acts in Furtherance of the Scheme and Artifice to Defraud for the Predicate Acts of Mail and Wire Fraud*

102.    Plaintiff hereby incorporates paragraphs 36 through 94 as fully set forth herein, more particularly paragraphs 50, 62, 75, 76, 80, 82, 85, 88-93, and further alleges as follows:

i.    Dr. Polukoff falsely stated he had authorization to receive the Stolen Hard Drive which contained Protected and Confidential Patient Information for approximately 10,000 patients;

ii.   Dr. Polukoff and the other participants in the Solicitation Enterprise, concealed from patients that they were using Protected and Confidential Patient Information for their own personal financial gain.

iii.  Dr. Polukoff concealed from Dr. Sorensen the communications with TecCon and the receipt of the Stolen Hard Drive;

iv.   Dr. Polukoff transported, transmitted, or transferred the Stolen Hard Drive, which contained data valued greater than $5,000, from Utah to Texas, crossing state lines, knowing it was stolen;

v.    Dr. Polukoff, without the authorization or consent of, and concealment from the patients, gave the Protected and Confidential Patient Information to Mr. Nolen and FNJ knowing that the information would be accessed, used and directed them to do so;

vi.   Mr. Nolen and FNJ, having knowledge that the Stolen Hard Drive was stolen and unlawfully converted, or taken, received and continue to possess the Stolen Hard Drive, in violation of federal law;

vii.  Dr. Polukoff, Mr. Nolen, and FNJ then retained Mr. Zabriskie and the Zabriskie Law Firm;

viii. Mr. Zabriskie and the Zabriskie Law Firm, having knowledge that the Stolen Hard Drive was stolen and unlawfully converted, or taken, received and continue to possess the Stolen Hard Drive and/or the Protected and Confidential Patient Information contained therein, in violation of federal law;

ix.   Mr. Nolen, FNJ, Mr. Zabriskie, and Zabriskie Law Firm continue to access the Stolen Hard Drive to obtain the Protected and Confidential Patient Information to directly, and in a targeted manner, solicit additional clients to pursue medical malpractice claims against Dr. Sorensen;

x.    Mr. Nolen, FNJ, Mr. Zabriskie, and Zabriskie Law Firm know and have admitted that the Stolen Hard Drive contains Protected and Confidential Patient Information that is protected by HIPAA and know that the patients have not authorized the use of the information;

xi.    Mr. Zabriskie and Zabriskie Law Firm have sent letters, made Facebook posts, placed advertisements containing false and misleading information to induce patients, despite the fact that the Honorable Jill Parrish held, as a matter of law, that the PFO closures performed by Dr. Sorensen could not be deemed unnecessary;

xii.    Defendants admit in their sworn affidavits that they have over 1,000 cases pending;

xiii.    Defendants have unlawfully accessed, used, and continue to use the Protected and Confidential Patient Information, which has damaged and continues to damage Dr. Sorensen;

### *Mailings related to Mail Fraud*

xiv.    Three letters have been transmitted on at least three occasions on or about sometime in 2016 (Reddit letter), June 14, and 27, 2017 were caused to be placed in the post offices or authorized depositories for mail matter, as well as the specific dates on which similar envelopes were mailed to the patients, can be readily ascertained from the records in the possession or under the control of the Defendants.

xv.    On information and belief, and based upon the volume of communications that would be necessary to solicit over 1,000 former patients, the number of fraudulent uses of the mail number in the hundreds if not thousands, and continue today.

### *Use of Interstate Wires Related to Wire Fraud*

xvi.     In furtherance of their scheme and artifice to defraud, Mr. Zabriskie and the Zabriskie Law Firm published statements on their website that one of the offending doctors performed approximately 7,000 PFO and ASD closures that were performed in violation of FDA and AMA standards (as of May 10, 2018 was still posted);[4] and

xvii.    Mr. Zabriskie and the Zabriskie Law Firm also published statements on their Facebook page[5] (on June 7, 2016, August 1, 2016, and Dec. 19, 2016) that Dr. Sorensen engaged in "medical abuse."

xviii.   The statements made on the website and Facebook page are patently false because the FDA and AMA did not have standards regarding PFO and ASD procedures at the time Dr. Sorensen was performing the procedures, the FDA does not regulate physicians and their practice of medicine, the FDA cannot mandate national standards of clinical practice or quality of care standards.

---

[4] The only doctor in Utah that would have performed that number of PFO and ASD procedures is Dr. Sorensen. The only way for Defendants to know that approximately 7,000 procedures were performed is to access the Stolen Hard Drive and review the Protected and Confidential Patient Information.

[5] The Facebook page records show that the posts made on June 7, August 1, and December 19, were commented on by few individuals, merely shared for a total of 25 times by Facebook users, and received very few reactions. This information shows that Defendants would have received very few patients from their Facebook posts, making the reasonable inference that the vast majority of the 1,000 patients that have pending cases, as asserted by Defendants, would have come from the letters sent using the Protected and Confidential Patient Information.

*The Pattern of Racketeering Activity*

103.    The acts set forth in proceeding paragraphs 96 through 102 constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). The Defendants have engaged in at least six predicate acts, which is more than enough to establish a cause of action under the RICO Statute.

104.    Defendants, either directly or indirectly, conducted and participated in the conduct of the enterprise's affairs by committing the predicate acts that establish pattern of racketeering activity as set forth in paragraphs 93 through 100, and did so in violation of 18 U.S.C. § 1962(c). The Defendants purpose and object are to fraudulently induce these patients to sue Dr. Sorensen for medical malpractice for their financial benefit.

105.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Dr. Sorensen has been injured in his business and property by the loss of the Stolen Hard Drive containing Protected and Confidential Patient Information, intellectual property, and other intangible assets of the business.

### SECOND CAUSE OF ACTION
**(Unlawful for any Person to Conspire to Violate any of the Provisions of § 1962 – 18 U.S.C. § 1962(d))**

106.    Plaintiff hereby incorporates paragraphs 1 through 105 as fully set forth herein.

*The Enterprise*

107.    This cause of action arises under 18 U.S.C. § 1962(d) and is asserted against all Defendants.

108.    For purposes of this particular cause of action under Section 1962(d), the Enterprise is the association in fact defined in paragraphs 91-93, *supra*.

### *The Conspiracy*

109.    All the Defendants and others unknown, aiding and abetting each other, acting in concert and/or combination, did knowingly, intentionally, and unlawfully agree to commit the multiple predicate acts (specifically described herein before) forming the alleged pattern of racketeering activity (also described herein before), as part of their unlawful scheme to defraud, and to obtain money from, the Plaintiff.

110.    All the Defendants have violated Section 1962(d), inasmuch as, in furtherance of their scheme to defraud and in order to effects its objectives, they knowingly, intentionally, and unlawfully, aiding and abetting each other, conspired to conduct and participate in, and did conduct and participate in, directly or indirectly, the affairs of the Solicitation Enterprise, through the pattern of racketeering activity described herein before, in violation of Section 1962(c).

111.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), Dr. Sorensen has been injured in his business and property by the loss of the Stolen Hard Drive containing Protected and Confidential Patient Information, intellectual property, and other intangible assets of the business.

### THIRD CAUSE OF ACTION
### (Misappropriation of Trade Secrets Against All Defendants –
### Utah Code Ann. §§ 13–24–1 through –9)

112.    Plaintiff hereby incorporates paragraphs 1 through 111 as fully set forth herein.

113.    At all relevant times, Dr. Sorensen was in possession of trade secrets—in the form of patient lists—as defined by Utah Code Ann. § 13–24–2(4).  The patient lists contained on the Stolen Hard Drive and other SCG billing records constitute trade secrets because Dr. Sorensen derives independent economic value from that information, such information is not generally

known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

114.    As a product of his employment with SCG, Dr. Polukoff had an affirmative duty to maintain the secrecy of these lists.  Furthermore, Dr. Polukoff did not have a right to access, use, or disclose this information.  Despite this fact, Dr. Polukoff continues to have access to Dr. Sorensen's patient lists because he breached his duty to maintain secrecy and stole the Stolen Hard Drive and other SCG billing records.  Subsequently, Dr. Polukoff disclosed Dr. Sorensen's patient lists to the Zabriskie Law Firm, Mr. Zabriskie, FNJ, and Mr. Nolen.

115.    Defendants Zabriskie Law Firm, Rhome Zabriskie, FNJ, and Rand Nolen have used Dr. Sorensen's patient lists without the express or implied consent of Dr. Sorensen or the patients themselves.  In using these patient lists, Defendants knew that their knowledge of the patient lists was derived from Dr. Polukoff who utilized improper means to acquire them and that Dr. Polukoff owed a duty to Dr. Sorensen to maintain their secrecy.

116.    As a proximate result of Defendants' misappropriation of Dr. Sorensen's trade secrets, Dr. Sorensen has suffered, and will continue to suffer, damages in an amount to be proven at the time of trial.

117.    As a further proximate result of Defendants' wrongful conduct and misappropriation, Dr. Sorensen has been injured, irreparably and otherwise, and is threatened with additional and on-going injuries.  Because Dr. Sorensen's remedy at law is inadequate, Dr. Sorensen seeks temporary, preliminary and permanent injunctive relief.

118.   Dr. Polukoff's misappropriation of the patient lists, as well as the Zabriskie Law Firm, Mr. Zabriskie, FNJ, and Mr. Nolen's continued use of Dr. Sorensen's patient lists was willful and malicious.   Therefore, Plaintiff is entitled to an award of exemplary damages and reasonable attorneys' fees pursuant to Utah Code Ann. §§ 13–24–4(2) & 5.

### FOURTH CAUSE OF ACTION
**(Conversion Against Dr. Polukoff – Utah Common Law)**

119.   Plaintiff hereby incorporates paragraphs 1 through 118 as fully set forth herein.

120.   By instructing TecCon to produce the Stolen Hard Drive without Dr. Sorensen's authorization and taking the Stolen Hard Drive offsite, Dr. Polukoff willfully interfered with chattel belonging to Dr. Sorensen.

121.   Dr. Polukoff's willful interference with the Stolen Hard Drive was without lawful justification, and deprived Dr. Sorensen of the exclusive use, possession, and/or control of the Stolen Hard Drive and the Protected Confidential Patient Information.

122.   As a proximate result of Dr. Polukoff's conduct, Dr. Sorensen has suffered, and will continue to suffer, damages in an amount to be proven at the time of trial.

123.   Because Dr. Polukoff's conduct was willful and malicious, and because it manifested a knowing and reckless indifference toward, and a disregard of, the rights of Dr. Sorensen and his patients in violation of federal law, he is entitled to an award of punitive damages against Dr. Polukoff pursuant to Utah Code Ann. § 78B–8–201(1)(a).

### FIFTH CAUSE OF ACTION
**(Receiving Stolen Property Against Zabriskie Law Firm, Rhome Zabriskie, FNJ, and Rand Nolen – Utah Code Ann. §§ 76–6–408 & 412)**

124.   Plaintiff hereby incorporates paragraphs 1 through 123 as fully set forth herein.

125.    During the course of his employment with SCG, Dr. Polukoff was not authorized to copy or take any patient medical files, billing records, or other records regarding patient care that were maintained by SCG and Dr. Sorensen.

126.    Despite this fact, Dr. Polukoff instructed TecCon to produce a backup hard drive to take off site.  Dr. Polukoff was not authorize to direct TecCon to produce the Stolen Hard Drive, nor was he authorized to possess the Stolen Hard Drive.

127.    The Zabriskie Law Firm, Mr. Zabriskie, FNJ, and Mr. Nolen, received and have retained a copy of the Stolen Hard Drive and SCG billing records from Dr. Polukoff.

128.    The Zabriskie Law Firm, Mr. Zabriskie, FNJ, and Mr. Nolen, know that Dr. Polukoff stole the Stolen Hard Drive and SCG billing records.

129.    As a proximate result of Defendants' conduct, Dr. Sorensen has suffered, and will continue to suffer, damages in an amount to be proven at the time of trial.  Pursuant to Utah Code Ann. § 76–6–412(2), Dr. Sorensen is entitled to monetary damages for three times the amount of actual damages, costs of suit, and reasonable attorney's fees.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy Against Zabriskie Law Firm, Rhome Zabriskie, FNJ, and Rand Nolen – Utah Common Law)

130.    Plaintiff hereby incorporates paragraphs 1 through 129 as fully set forth herein.

131.    On information and belief, Zabriskie Law Firm, Mr. Zabriskie, FNJ, and Mr. Nolen, conspired to initiate extensive medical malpractice litigation against Dr. Sorensen, SCG, and other medical facilities.

132.    As part of the conspiracy, Zabriskie Law Firm, Mr. Zabriskie, FNJ, and Mr. Nolen accessed the Stolen Hard Drive and SCG billing records to ascertain the names, contact information, and medical care received by Dr. Sorensen's former patients.

133.    Despite knowing that the Stolen Hard Drive and SCG billing records were stolen, Zabriskie Law Firm, Mr. Zabriskie, FNJ, and Mr. Nolen contacted over 1,000 of Dr. Sorensen's former patients to solicit their participation in medical malpractice suits against Dr. Sorensen, SCG, and other medical facilities.

134.    As a proximate result of Defendants' conduct, Dr. Sorensen has suffered, and will continue to suffer, damages in an amount to be proven at the time of trial.

## SEVENTH CAUSE OF ACTION
### (Application for Injunctive Relief Against All Defendants)

135.    Plaintiff hereby incorporates paragraphs 1 through 134 as fully set forth herein.

136.    Defendants' actions have harmed and threaten to harm Dr. Sorensen.  Should Defendant's be allowed to retain and use the information on the Stolen Hard Drive and SCG billing records, Dr. Sorensen will continue to face the possibility of frivolous malpractice actions, as well as the uncertainty of whether he is required to report Defendants' use of the Stolen Hard Drive and SCG billing records under HIPAA.  Additionally, the information contained on the Stolen Hard Drive and SCG billing records pertains to Dr. Sorensen's former patients.  This information rightfully belongs to Dr. Sorensen and Defendants' retention and use of the Stolen Hard Drive and SCG billing records constitutes a violation of both federal and state law.

137.    As a result of the numerous and ongoing violations of federal and state law, Dr. Sorensen is entitled to injunctive relief prohibiting Defendants from accessing, deleting, modifying, copying, or using the Stolen Hard Drive or SCG billing records.

138.    As a result of the numerous and ongoing violations of federal and state law, Dr. Sorensen is further entitled to injunctive relief requiring Defendants to return the SCG Drive, its contents, the SCG billing records, and any copies of the SCG Drive or SCG billing records to Plaintiff.  Defendants should also be required to deliver any notes, memoranda, summaries, or compilations in their possession that contain information from the SCG Drive or SCG billing records.  The Court should also require Defendants to verify under oath that they have delivered all such documents and information as noted above, and have not retained any copies in any form or format.

## PRAYER FOR RELIEF

WHEREAS, Plaintiff prays for relief against Defendants as follows:

A.    A decree from this Court that Defendants are in possession of individually identifiable health information as defined by federal law;

B.    A decree from this Court that Defendants' use of the individually identifiable health information in their possession is unauthorized by federal law;

C.    An award of actual damages as proven at trial on all appropriate claims in the Complaint;

D.    An award for the damage arising from the unauthorized access and possession of business property, including but not limited to, the Stolen Hard Drive containing Protected and Confidential Patient Information, intellectual property, and intangible assets of the business.

E.    An award of all statutory damages as allowed by federal or state law;

F.    That each of the Defendants and its respective officers, agents, attorneys, and employees, and all other persons acting or planning to act on behalf thereof, or in concert

therewith be perpetually enjoined and restrained from, directly or indirectly, accessing, deleting, modifying, copying, or using the Stolen Hard Drive or SCG billing records.

G.      That this Court grant an injunction against the Defendants, compelling them to: (1) return the Stolen Hard Drive, its contents, the SCG billing records, and any copies of the Stolen Hard Drive or SCG billing records to Plaintiff; (2) deliver any notes, memoranda, summaries, or compilations in Defendants' possession that contain information from the Stolen Hard Drive or SCG billing records; and (3) verify under oath that they have delivered all such documents and information as noted above, and have not retained any copies in any form or format.

H.      An award of punitive or treble damages as allowed by law;

I.      An award of pre-judgment and post-judgment interest as allowed by law;

J.      An award of costs and attorneys' fees incurred by Plaintiff herein as allowed by law; and

K.      Any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action for which a jury is permitted.

## **VERIFICATION**

DATED this _14_ day of _MAY_____, 2018.

_[signature]_

SHERMAN G. SORENSEN

STATE OF _ARIZONA_ )
                        )  :ss
COUNTY OF _MARICOPA_)

On the _14_ day of _MAY_____, 2018, personally appeared before me SHERMAN G. SORENSEN; who duly acknowledged to me that he has read the foregoing *Amended Verified Complaint and Jury Demand*; that the same is true to the best of his knowledge, information and belief; and, that he duly executed the same.

Notary Public
15

_[notary seal: MARK WATERS, Notary Public - State of Arizona, MARICOPA COUNTY, My Commission Expires March 15, 2020]_

_[signature]_

MARK WATERS

DATED this 14th day of May, 2018.

**STIRBA, P.C.**

By:  /s/ Peter Stirba
PETER STIRBA
JEFFERY C. BRAMBLE
CHAD A. TENGLER
***Attorneys for Plaintiff Sherman G.***
***Sorensen, M.D.***

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May 2018, a true copy of the foregoing **AMENDED VERIFIED COMPLAINT AND JURY DEMAND** was served by the method indicated below, to the following:

Phillip E. Lowry                                              (  ) U.S. Mail, Postage Prepaid
P.O. Box 901573                                            (  ) Hand Delivered
Sandy, UT 84090                                            (  ) Overnight Mail
phillip.e.lowry@gmail.com                            (  ) Facsimile
                                                                       (X) Electronic Filing


Rand P. Nolen                                               (  ) U.S. Mail, Postage Prepaid
Gregory D. Brown                                        (  ) Hand Delivered
David L. Hobbs                                            (  ) Overnight Mail
Fleming, Nolen & Jez, LLP                          (  ) Facsimile
2800 Post Oak Blvd., Suite 4000                 (X) Electronic Filing
Houston, TX 77056-6109
rand_nolen@gleming-law.com
gregory_brown@fleming-law.com
david_hobbs@fleming-law.com

By:   /s/ Randy Torres