IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF UTAH

| | |
|---|---|
| SHERMAN G. SORENSEN, M.D.,<br><br>Plaintiff,<br>vs.<br><br>GERALD I. POLUKOFF, M.D.; ZABRISKIE LAW FIRM, LLC, a Utah limited liability company; RHOME ZABRISKIE, J.D.; FLEMING, NOLEN & JEZ, LLP, a Texas limited liability partnership; and RAND P. NOLEN, J.D.,<br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' RENEWED MOTION TO DISMISS AND DENYING DEFENDANTS' CONDITIONAL MOTION FOR RETENTION OF SUPPLEMENTAL JURISDICTION<br><br>CASE NO. 2:18-CV-67 TS<br>Judge Ted Stewart |

This matter is before the Court on Defendants' second Motion to Dismiss ("SMD"), Dr. Sherman Sorensen's ("Plaintiff") Motion for Preliminary Injunction, and Defendants' Conditional Motion for Retention of Supplemental Jurisdiction. For the following reasons, the Court will grant the SMD as to Plaintiff's federal claims, deny the Motion for Retention of Supplemental Jurisdiction, thereby declining to exercise supplemental jurisdiction over Plaintiff's state-law claims, and deny the Motion for Preliminary Injunction.

## I.      BACKGROUND

Plaintiff formed the Sorensen Cardiovascular Group ("SCG") in 2006 and provided cardiology services in Salt Lake City, Utah, until December 2011. Plaintiff is known for his expertise in patent foramen ovale ("PFO") closures and atrial septal defect ("ASD") closures, both of which are used to fix a defect in the septum between the upper atrial chambers of the heart.

In 2009, Dr. Gerald Polukoff met with Plaintiff about working for SCG as a Cardiologist and learning more about PFO closure techniques. However, Dr. Polukoff did not start working at SCG until June 2011. Then, in July 2011, Plaintiff suffered a heart attack and decided to retire at the end of the year. Plaintiff discussed his retirement with Dr. Polukoff, and the decision was made to either pay out the rest of Dr. Polukoff's contract or turn SCG over to him. "Dr. Polukoff indicated that he would consider the offer, but that he would need to ensure the financial viability of SCG before deciding to either accept or reject."[1]

SCG stored its patient billing records on a series of hard drives that were maintained by TecCon, Inc.[2] Plaintiff claims that Dr. Polukoff was not authorized to access these hard drives, but Dr. Polukoff allegedly met with TecCon on October 7, 2011, and was provided with a hard drive to take offsite and remote access to SCG's billing records.

A month later, Dr. Polukoff informed Plaintiff that he would not assume ownership of SCG. Plaintiff paid out the rest of Dr. Polukoff's contract and terminated his employment. Plaintiff learned soon after Dr. Polukoff's termination that Dr. Polukoff had remote access to SCG's billing records and that a backup hard drive might be missing. Plaintiff instructed TecCon to terminate Dr. Polukoff's access and sent an email asking Dr. Polukoff if he "was aware of a missing backup hard drive. Dr. Polukoff denied any knowledge of a missing hard drive and indicated to Dr. Sorensen that he would look through his things for a hard drive, but never indicated as to whether one was ultimately found."[3]

---

[1] Docket No. 2 ¶ 38.

[2] "These patient billing records contained confidential and sensitive patient information, which included: (1) patient names, addresses, telephone numbers, and other personal identifying information; (2) patient demographic information; (3) patient insurance information; (4) patient charges; and (5) a summary of the care received by SCG patients." *Id.* ¶ 14.

[3] *Id.* ¶ 52.

On December 6, 2012, Dr. Polukoff initiated a *qui tam* action against Plaintiff, SCG, St. Mark's Hospital, Intermountain Healthcare, Intermountain Medical Center, and HCA Healthcare ("HCA") in the United States District Court for the Middle District of Tennessee. Dr. Polukoff alleged "that Dr. Sorensen had performed medically unnecessary PFO closures on patients and conspired with the other defendants in the *qui tam* action to improperly bill the United States Government by submitting false claims for reimbursement under Medicare and Medicaid."[4]

As part of the *qui tam* action, Dr. Polukoff allegedly delivered a SCG hard drive to Mr. Rand Nolen and Fleming, Nolen, & Jez, L.L.P ("FNJ") who were located in Texas and acting as co-counsel for Dr. Polukoff in the *qui tam* action. Counsel for Plaintiff then sent a letter to Mr. Nolen demanding the return of the hard drive and demanding that Dr. Polukoff and his attorneys provide declarations under oath that they did not alter or copy any of the files on the hard drive. The hard drive has not been returned to Plaintiff.

Eventually, Dr. Polukoff's claims against HCA were dismissed, and the case was transferred to this Court where the Honorable Judge Jill Parrish dismissed the remainder of the action with prejudice on January 19, 2017. Dr. Polukoff appealed the decision, with the United States intervening on the appeal only, and the Tenth Circuit reversed and remanded the action, holding that Dr. Polukoff's amended complaint against Dr. Sorensen, St. Mark's, and Intermountain Medical Center satisfied the pleading requirements of Rules 12(b)(6) and 9(b).[5]

On January 19, 2018, Plaintiff brought this action against Dr. Polukoff, Mr. Nolen, FNJ, Rhome Zabriskie, and the Zabriskie Law Firm, LLC (collectively, "Defendants") asserting claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") along with

---

[4] *Id.* ¶ 54.

[5] *See United States ex rel. Polukoff v. St. Mark's Hosp.*, No. 17-4014, 2018 WL 3340513 (10th Cir. July 9, 2018).

several state claims. According to Plaintiff, Mr. Nolen and FNJ used the patient billing information on the SCG hard drive to identify Plaintiff's former patients and sent that information to Mr. Zabriskie and the Zabriskie Law Firm (collectively, "Law Firm Defendants"). Plaintiff alleges that the Law Firm Defendants are now working together and using the confidential patient information from the hard drive to target and solicit Plaintiff's former patients to participate in medical malpractice lawsuits against Plaintiff.

The Court granted in part Defendants' first Motion to Dismiss, dismissing the RICO claims for failure to sufficiently plead at least two predicate acts. The Court allowed Plaintiff to file an Amended Complaint and Defendants have now filed this SMD.

## II.    STANDARD OF REVIEW

In considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to Plaintiff as the nonmoving party.[6] Plaintiff must provide "enough facts to state a claim to relief that is plausible on its face,"[7] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[8] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[9]

---

[6] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[7] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[9] *Id.* (quoting *Twombly*, 550 U.S. at 557) (alteration in original).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[10] As the Court in *Iqbal* stated,

> only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well–pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.[11]

## III.    DISCUSSION

Because this Court's jurisdiction rests on federal question jurisdiction, the Court deems it appropriate to first consider the SMD as it relates to Plaintiff's federal claims.

## A.  CIVIL RICO CLAIM

In this action, federal jurisdiction rests on Plaintiff's RICO claims. Section 1964(c) of RICO provides a private right of action for persons injured in their business or property by reason of a violation of § 1962. Plaintiff claims that Defendants violated 18 U.S.C. § 1962(c), which provides:

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"That is, RICO vests a private citizen with substantive rights to avoid 'injur[ies]' to 'his business or property' caused by a pattern of racketeering activity, and it explicitly creates a federal cause of action to vindicate those federal rights."[12] "To survive a Rule 12(b)(6) motion, a civil RICO

---

[10] *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[11] *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted).

[12] *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017) (quoting 18 U.S.C. § 1964(c)).

claim must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"[13] Then, if the complaint meets the Rule 12(b)(6) and Rule 9(b) requirements for pleading a violation of § 1962, the Court must determine whether the pleadings plausibly allege "that the plaintiff's business or property was injured; and []that the defendant's violation is the cause of that injury."[14]

Defendants argue that dismissal is warranted because Plaintiff failed to sufficiently plead a § 1962 violation and failed to plead an actual injury to his business or property. The Court agrees that Plaintiff failed to plead a § 1962 violation as he failed to plead the two predicate acts necessary to establish a pattern of racketeering.[15]

A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."[16] Additionally, "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."[17]

---

[13] *Cayman Expl. Corp. v. United Gas Pipe Line Co*., 873 F.2d 1357, 1362 (10th Cir. 1989) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

[14] *Safe Sts. All.*, 859 F.3d at 881.

[15] With no violation of § 1962, the Court need not determine whether Plaintiff properly pleaded an actual injury.

[16] 18 U.S.C. § 1961(5).

[17] *H.J. Inc. v. Nw. Bell Tel. Co*., 492 U.S. 229, 239 (1989). "In our view, Congress had a more natural and commonsense approach to RICO's pattern element in mind, intending a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *Id.* at 237.

Plaintiff asserts that Defendants engaged in the predicate acts of mail fraud, wire fraud, the transportation of stolen goods, and the receipt of stolen goods. "To establish the predicate act of mail fraud, [Plaintiff] must allege '(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme."[18] "The elements of wire fraud are very similar, but require that the defendant use interstate wire, radio or television communications in furtherance of the scheme to defraud."[19]

> "[T]he common thread among . . . these crimes is the concept of 'fraud.' Actionable fraud consists of (1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9) injury." Failure to adequately allege any one of the nine elements is fatal to the fraud claim.[20]

Finally, "the particularity requirement of Rule 9(b), Federal Rule of Civil Procedure, applies to claims of mail and wire fraud," so the Complaint "must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof . . . and must also identify the purpose of the mailing within the defendant's fraudulent scheme."[21] The policy of simplicity which underlies Rule 9(b)'s heightened pleading requirements "requires a court to read Rule 9(b)'s requirements in harmony with Rule 8's call for a 'short and plain statement of the claim' which presents 'simple, concise,

---

[18] *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir. 1991)); *see* 18 U.S.C. § 1341.

[19] *Tal*, 453 F.3d at 1263 (quoting *BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1102 (10th Cir. 1999)).

[20] *Id.* (quoting *BancOklahoma Mortg. Corp.*, 194 F.3d at 1103).

[21] *Id.* (internal citations and quotation marks omitted); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

and direct' allegations."[22] However, "the threat of treble damages and injury to reputation which attend RICO actions justify requiring plaintiff to frame its pleadings in such a way that will give the defendant, and the trial court, clear notice of the factual basis of the predicate acts."[23]

1. *Mail Fraud*

Plaintiff alleges that the Law Firm Defendants are sending solicitation letters to Plaintiff's former patients which contain false statements that Plaintiff performed unnecessary PFO closures. Plaintiff alleges that, along with similar envelopes that can be ascertained through discovery, letters were sent sometime in 2016, on June 14, 2017, and on June 27, 2017, and Plaintiff believes that "the number of fraudulent uses of the mail number in the hundreds if not thousands, and continue today."[24] In support of this, Plaintiff lists the names of twenty-two patients who allegedly filed complaints after the hard drive was used to identify them and send them letters.

One of these letters, the 2016 letter, is allegedly from the Zabriskie Law Firm and was found on Reddit.com. The letter is not provided in the Amended Complaint, but allegedly states that "more than 400 patients have joined this litigation. In cases where there are no obvious side effects [the Zabriskie Law Firm] still assess[es] a value exceeding $100,000."[25]

The June 14 letter is also not provided in the Amended Complaint, and Plaintiff does no more than state that it exists, but the June 27 letter is provided and was allegedly sent unsolicited to one of Plaintiff's patients. The letter is signed by Rhome Zabriskie and is on the Zabriskie

---

[22] *Cayman Expl. Corp.*, 873 F.2d at 1362.

[23] *Id.*

[24] Docket No. 44 ¶ 102(xv).

[25] *Id.* ¶ 83.

Law Firm letterhead, but the patient's identifying information has been redacted from the letter and an un-redacted version has not been provided to the Court.

The letter, entitled "PFO/ASD litigation update letter," begins by stating, "I think you will be interested to hear that we conducted the first of what will be hundreds of hearings before the Department of Professional Licensing (DOPL)."[26] The letter explains that in the first hearing, the "DOPL panel found that our claim against the doctor (performing an unnecessary pfo/asd closure procedure) had merit. Keep in mind that the facts in this client's case were nearly identical to the facts in your case."[27] The letter states that the claim may now be filed and many other cases are being scheduled for hearings. The letter ends by stating:

> We are still very interested in your case and would love the opportunity to represent you. If you still have the paperwork that we provided for your signature, please get it signed and returned to us as soon as possible. If you do not have that paperwork, please contact my office immediately and let us know so that we can send you new paperwork. Please act on this quickly as there are time-deadlines for filing. Also, it would be ideal if we could keep your case on pace with others as we work these matters closer to verdict or settlement.[28]

Plaintiff concludes from this letter that "the only way Mr. Nolen, FNJ, Mr. Zabriskie, or the Zabriskie Law firm could state that two patients' cases were nearly identical would be if the Stolen Hard Drive was accessed to view the patient's records and medical services received."[29]

Defendants argue that, "the Zabriskie Law Firm letters are in no way improper. Sorensen places paramount importance upon a single sentence stating the case was 'nearly identical' to the recipient's case. But nothing is false, fraudulent, or misleading about that statement."[30] In other

---

[26] *Id.* ¶ 80.

[27] *Id.*

[28] *Id*.

[29] *Id.* ¶ 82 (internal quotation marks and alteration omitted).

[30] Docket No. 47, at 14.

words, "[a]lthough Sorensen highlights what he disagrees with in the contents of the letter, he fails to offer well-pled facts demonstrating it was used as part of a mail fraud scheme."[31]

The Court previously found that Plaintiff had "show[n] how the mailings fit in with Defendants' alleged scheme,"[32] but, Plaintiff's Amended Complaint fails to plead with particularity that a scheme to defraud by false pretenses, representations, or promises exists. The June 27 letter does not name Plaintiff, and the patient's name is redacted. More significantly, however, Plaintiff fails to show any false representations or promises in the letters. Instead, he argues that the hard drive must have been accessed. But this is beside the point. Plaintiff must provide specific factual allegations demonstrating the falsity of the statements. This he has not done. Instead, he makes the conclusory statement that the statements are false. This is insufficient.

For these reasons, Plaintiff failed to plead with particularity that the Defendants are using the mail to defraud or obtain money by false pretenses, representations or promises. Therefore, the Court will not consider mail fraud as a predicate act in Plaintiff's RICO claim.

2. *Wire Fraud*

Plaintiff alleges that Defendants are also using the internet "to solicit patients and fraudulently induce them into filing malpractice claims against Plaintiff."[33] In support of these allegations, the Amended Complaint contains an advertisement Rhome Zabriskie placed in the Salt Lake Tribune (the "Advertisement") and screenshots of posts from the Zabriskie Law Firm's website and Facebook page.

---

[31] *Id.*

[32] Docket No. 41, at 9.

[33] Docket No. 52, at 14.

The Advertisement, entitled "Utah Lawyer Exposes PFO and ASD Heart Surgery Scandal in Salt Lake: The Bernie Madoff of Heart Surgery Hits Utah Hard," was run on May 15, 2016. A screenshot of the advertisement is included in the Amended Complaint, but the image is too small, and the resolution is too low to be legible. However, Plaintiff alleges that it contains the following false allegations:

1. The American Medical Association and the FDA indicate that in the vast majority of cases, patients are exposed to more risk with surgery than by simply leaving the hole alone;
2. I discovered there were terrible abuses to PFO and ASD by a local cardiologist (we'll call Dr. X);
3. This deception resulted in bias with some local radiologists who began offering MRI reads skewed in favor of Dr. X's unethical PFO and ASD surgery practices;
4. On multiple occasions my source claims to have seen Dr. X deliberately punch out and enlarge otherwise clinically insignificant holes in the hearts of patients, only to close the holes by using the expensive and permanently-implanted closure devises[sic]; and
5. According to the FDA advisory, many of Dr. X's patients are also now at risk of developing potentially fatal heart tissue erosion.[34]

Plaintiff also argues that, while not named in Advertisement, he is the only doctor in Utah that would have performed the number of PFO and ASD closures mentioned in the Advertisement, and Defendants could not know how many procedures were performed without accessing the hard drive.

Next, the Amended Complaint provides a screenshot of a Zabriskie Law Firm webpage that states, "[r]ecent evidence shows that many of these procedures were performed in violation of FDA and AMA standards."[35] Plaintiff argues that "[t]his information is false because prior to

---

[34] Docket No. 44 ¶ 87 (internal quotation marks and alteration omitted).

[35] Id. ¶ 89.

2012, the time the surgeries were performed, no such standards existed. Moreover, the FDA does not regulate the practice of medicine."[36]

Finally, Plaintiff provides a screenshot of a Zabriskie Law Firm Facebook post from June 7, 2016. Plaintiff argues that the post falsely states that the doctor committed medical abuse, the PFO and ASD surgeries were part of a scheme, and that the surgeries violated FDA and AMA standards. According to Plaintiff, "[i]n the *Qui Tam* action, Defendants admit that the FDA did not issue FDA recommendations until February 2014, well after Dr. Sorensen retired."[37] Plaintiff also argues "that some of the individuals that commented [on the Facebook post] were patients of Dr. Sorensen[, and] it is logical, based upon Defendant[']s assertions, that at least some of the unnamed 1,000 patients saw the post and signed up for the meritless litigation."[38]

Defendants argue that the content of the Advertisement and posts is "both truthful and permissible, [and] the advertising does not evidence any purpose of 'executing a scheme to defraud.'"[39] They also argue that Plaintiff is not named in any of the advertising, attorney advertising is protected by the First Amendment, and the Utah State Bar governs solicitation. Finally, Defendants argue that Plaintiff's pleadings regarding comments on the Facebook post are without merit since the comments are not pleaded in the Amended Complaint, thereby leaving Plaintiff to make arguments based "on unidentified supposed 'former patients'" who viewed the post.[40]

---

[36] *Id.* ¶ 90.

[37] *Id.* at 22 n.3.

[38] Docket No. 52, at 13.

[39] Docket No. 47, at 16.

[40] Docket No. 53, at 5.

As with his mail fraud allegations, Plaintiff's Amended Complaint fails to plead with particularity the existence of a scheme to defraud by false pretenses, representations or promises that is being furthered by Defendants' advertisements. First, the Amended Complaint contains conclusory allegations as to which parts of the advertisements are allegedly false but fails to plead any facts that support those allegations. For instance, one of the few conclusory allegations Plaintiff attempts to support is the alleged falsity of the website statement that "recent evidence shows that many of these procedures were performed in violation of FDA and AMA standards." Plaintiff argues that this information is false because no such standards existed before 2012, but the full paragraph on the website is broadly written and does not limit its scope to cases before 2012 or to specific doctors, hospitals, or patients, stating:

> Utah has had inordinately high numbers of patients who had PFO and ASD heart closure procedures. From 2001 to present, an estimated 10,000 procedures were performed in Utah. This represents a disproportionate number of patients having PFO closures and similar ASD (atrial septal defect) closures performed in the catheter labs of local hospitals. Recent evidence shows that many of these procedures were performed in violation of FDA and AMA standards.[41]

With nothing more than a statement that these standards did not exist before 2012, the broad nature of this post fails to support Plaintiff's theory of the alleged fraudulent scheme.

Further, the Advertisement and posts provided by Plaintiff are public, and there is nothing in the Amended Complaint that connects the names on the hard drive to any of Plaintiff's patients that saw the posts and subsequently filed claims against Plaintiff. Plaintiff attempts to remedy this by alleging that Plaintiff's former patients commented on the Facebook post, but Plaintiff failed to provide those comments or the names of the patients who wrote the comments in his Amended Complaint.

---

[41] Docket No. 44 ¶ 89.

Finally, Plaintiff attempts to expand the scope of the alleged scheme in his Opposition by arguing that "[t]he scheme to defraud is not limited to the theft of the Stolen Hard Drive and Protected and Confidential Patient Information, but includes fraudulently inducing patients through advertising."[42] However, Plaintiff did not plead this expanded-scheme theory in his Amended Complaint. Even if he did, Plaintiff failed to plead with particularity the existence of any falsities in the advertisements that Defendants allegedly used to fraudulently induce his former patients to file claims against him.

For these reasons, Plaintiff failed to plead wire fraud with particularity, and the Court will not consider wire fraud to be a predicate act in Plaintiff's RICO claim.

3. *Interstate Transportation and Receipt of Stolen Goods*

Under 18 U.S.C. §§ 2314 and 2315, a person cannot transport or receive in interstate commerce any goods worth $5,000 or more while knowing that the goods are stolen or acquired through fraud. Both statutes "appl[y] only to physical goods, wares or merchandise. Purely intellectual property is not within this category. It can be represented physically, such as through writing on a page, but the underlying, intellectual property itself, remains intangible."[43]

Plaintiff argues that Defendants violated these statutes when Dr. Polukoff allegedly stole the hard drive containing the confidential patient information from SCG and sent the hard drive to Mr. Nolen and FNJ. Plaintiff also alleges that Mr. Nolen and FNJ knew that the hard drive was stolen, and that Mr. Nolen transported the hard drive "to Mr. Zabriskie and the Zabriskie Law Firm, where Mr. Zabriskie received it. Mr Zabriskie knew the Stolen Hard Drive and

---

[42] Docket No. 52, at 14.

[43] *United States v. Brown*, 925 F.2d 1301, 1307 (10th Cir. 1991) (internal quotation marks omitted). "The element of physical 'goods, wares, or merchandise' in §§ 2314 and 2315 is critical. The limitation which this places on the reach of the National Stolen Property Act is imposed by the statute itself, and must be observed." *Id.* at 1308–09.

Protected and Confidential Patient Information was stolen, has a value that exceeds $5,000, and that he did not have a right to possess it."[44]

Defendants argue that "no hard drive was ever stolen, nor has Sorensen ever brought any well-pled allegations to the contrary."[45] According to Defendants, "[w]ith Dr. Sorensen's full knowledge and consent, Dr. Polukoff backed up Sorensen Cardiovascular Group's records onto four separate hard-drives. Three of those were hard-drives purchased by Sorensen Cardiovascular Group. The fourth hard-drive was purchased by Dr. Polukoff, which is the one that is currently in [the] firm's possession."[46] Defendants also argue that Plaintiff's claims fail because the data on the hard drive does not fall under the definition of a "good."

Finally, Defendants argue that Plaintiff "baldly alleges that there is a missing SCG hard drive worth over $5,000" without providing "specifics about the hard drive, such as identifying its model; when/where and by whom it was purchased; its price; or any other material information," and, therefore, fails to plead a violation.[47] Plaintiff did not controvert these arguments in his Opposition.

First, the information on the hard drive is intangible information that does not fit within the definition of a "good,"[48] so the value of the hard drive itself must be $5,000 or more in order for Plaintiff to plead the violations of these statutes as predicate acts. That being said, Defendants

---

[44] Docket No. 52, at 10.

[45] Docket No. 47, at 16.

[46] *Id.* at 3–4.

[47] *Id.* at 4.

[48] *See Brown*, 925 F.2d at 1308 ("Here we agree that the property . . . does not meet the requirement of §§ 2314 and 2315 respecting 'goods, wares, or merchandise.' We hold that the computer program itself is an intangible intellectual property, and as such, it alone cannot constitute goods, wares, merchandise, securities or moneys which have been stolen, converted or taken within the meaning of §§ 2314 or 2315.").

correctly point out in the SMD the fact that Plaintiff failed to do more than provide conclusory allegations regarding the value of the hard drive. The Amended Complaint and subsequent filings contain no factual allegations supporting Plaintiff's statement that the hard drive is worth $5,000 or more. If the hard drive is in fact stolen SCG property, Plaintiff should be able to give an exact value of the hard drive, including the brand, size, serial number, and other identifying information to support his claim.

In a similar situation in *Spence v. Basic Research*,[49] the court found the following:

> The Amended Complaint contains no allegation that 18 U.S.C. § 2314 has been satisfied other than the conclusory statement that the value of the money allegedly "transported, transmitted, or transferred" is $5,000. In order to prove such a claim, Plaintiff must include allegations to support that sum. Therefore, she has not adequately pled 18 U.S.C. § 2314 violation(s), leaving only mail and wire fraud allegations to potentially show a pattern.[50]

With nothing in the Amended Complaint to support the sum alleged by Plaintiff, he fails to plead a violation of §§ 2314 and 2315, and the Court will not consider these alleged actions as predicate acts.

Therefore, because Plaintiff failed to properly plead two predicate acts under RICO, the Court finds Plaintiff's § 1962(c) RICO claim defective and dismisses it for having failed to state a claim upon which relief may be granted.

### 4. *Section 1962(d) RICO Conspiracy Claim*

Plaintiff's Amended Complaint includes a claim under subsection (d) of the RICO statute which makes it "illegal 'for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.'"[51] "By its terms, § 1962(d) requires that a plaintiff must first

---

[49] No. 2:16-CV-925-CW, 2017 WL 2416913 (D. Utah June 2, 2017).

[50] *Id.* at *7.

[51] *Tal*, 453 F.3d at 1270 (quoting 18 U.S.C. 1962(d)).

allege an independent violation of subsections (a), (b), or (c), in order to plead a conspiracy claim under subsection (d)."[52] In other words, "[i]f a plaintiff has no viable claim under § 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law."[53] Therefore, because Plaintiff failed to allege a claim under subsection (c), and alleged no claims under the other subsections, his § 1962(d) conspiracy claim fails, and the Court dismisses the claim.

## B.  STATE-LAW CLAIMS

Plaintiff's Amended Complaint asserts the following state-law claims: (1) conversion against Dr. Polukoff under Utah common law; (2) receiving stolen property against the Zabriskie Law Firm, Rhome Zabriskie, FNJ, and Rand Nolen under Utah Code Annotated §§ 76-6-408–412; and (3) civil conspiracy against the Zabriskie Law Firm, Rhome Zabriskie, FNJ, and Rand Nolen under Utah common law. Following briefing of the SMD, Defendants filed a Motion for Retention of Supplemental Jurisdiction conditioned upon the dismissal of Plaintiff's federal claims. For the following reasons, the Court will deny the Motion and decline to exercise jurisdiction over Plaintiff's state-law claims.

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."[54] In other words, "[t]he state and federal claims must derive from a common nucleus of operative fact" and are "such that [Plaintiff]

---

[52] *Id.*

[53] *Id.*; *see also Condict v. Condict,* 826 F.2d 923, 927 (10th Cir. 1987) ("[A]ny claim under § 1962(d) based on a conspiracy to violate the provisions of 18 U.S.C. § 1962(a), (b), or (c) must necessarily fail if the substantive claims are themselves deficient.").

[54] 28 U.S.C. § 1367(a).

would ordinarily be expected to try them all in one judicial proceeding . . . ."[55] In this action, a common nucleus of facts exists and the Court may retain jurisdiction, but this is only the starting point of the inquiry.

"It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."[56] "[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims."[57] Courts should avoid "needless decisions of state law . . . both as a matter of comity and to promote justice between the parties,"[58] and "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[59]

According to Defendants, Plaintiff's federal and state claims all derive from a common nucleus of facts as Plaintiff alleges throughout the claims that Defendants stole the hard drive from SCG and used the information to solicit Plaintiff's former patients. Defendants also argue that substantial time and energy have been spent litigating this case, the remaining claims are not predominant, novel, or complex, and fairness and convenience weigh in favor of Defendants not being forced to start over elsewhere. There is also the related *qui tam* litigation before Judge Parrish, which Defendants' argue warrants retaining the state-law claims. Finally, Defendants allege that, "[i]n the near future, [they] plan on moving for sanctions against Sorensen and his

---

[55] *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

[56] *Id.* at 726.

[57] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

[58] *Gibbs*, 383 U.S. at 726.

[59] *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)).

counsel,"[60] and "[b]ecause the Court is familiar with the parties, facts, and legal standards, it is appropriate for it to entertain the sanctions motion."[61]

Plaintiff argues, however, that this case is still in its early stages, this action will not be consolidated with the *qui tam* action and these "cases will be argued before different judges regardless of whether this Court exercises supplemental jurisdiction,"[62] and sanctions are inappropriate in this case. Therefore, "the factors of judicial economy, convenience, fairness, and comity all weigh in favor of this Court declining to exercise supplemental jurisdiction."[63]

First, as to Defendants' time and energy argument, this case was filed only seven months ago. Two complaints have been filed and two 12(b)(6) motions have been briefed, but relative to the complexity of the claims asserted by Plaintiff, along with the fact that the Amended Pleadings deadline is still over two months away, discovery is not due until June 30, 2019, and the trial is not set until January 20, 2020, this case is still in its early stages. In support of their argument, Defendants quote *Anglemyer v. Hamilton County Hospital*,[64] in which the court held that "[a] federal court justifiably may retain jurisdiction of the pendent claims when substantial time and energy have been expended on the case prior to the disposition of the federal claims."[65] However, in that case the parties had completed all necessary pretrial proceedings and the court still declined to exercise jurisdiction due to a novel and complex issue of state law in the case. For these reasons, the amount of time expended does not weigh in favor of retaining jurisdiction.

---

[60] Docket No. 55, at 7.

[61] *Id.* at 8.

[62] Docket No. 56, at 5.

[63] *Id.* at 10.

[64] 58 F.3d 533 (10th Cir. 1995).

[65] *Id.* at 541 (quoting *Jones v. Intermountain Power Project*, 794 F.2d 546, 550 (10th Cir. 1986)).

Defendants' next argument, that a lack of predominant, novel or complex state law should lead the Court to retain jurisdiction also fails. While the existence of such a claim would weigh in favor of declining to retain jurisdiction, the Tenth Circuit has held that, "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[66] This is not a case "in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong."[67] Therefore, this argument is not enough to overcome the presumption that the Court should decline jurisdiction.

The next two arguments similarly fail. First, even if Plaintiff brings his state-law claims in state court, neither party will have to start over as the claims and related arguments have largely been made in this case, and this Court has not ruled on any of the state-law arguments. Therefore, while the judge who is assigned the case will have to start from the beginning, the parties will not, and the new judge will have the benefit of being more familiar and more appropriately suited to deal with issues of Utah law. Second, while the underlying facts in this case overlap with the facts in the related *qui tam* action, the legal issues are wholly unrelated, the parties are not all the same, the *qui tam* action is before a different judge, the cases will not be consolidated, and in no way will the disposition of this case be made easier or more appropriate by the fact that the *qui tam* proceedings are also occurring in federal court.

Finally, Defendants correctly state that a "district court retains jurisdiction to impose and enforce sanctions until the court enters a final judgment,"[68] and the Court would be the appropriate forum in which to bring a motion for sanctions regarding the litigation of this action

---

[66] *Koch*, 660 F.3d at 1248 (quoting *Smith*, 149 F.3d at 1156).

[67] *Gibbs*, 383 U.S. at 726.

[68] *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1123 (10th Cir. 2003).

thus far. However, no motion has been filed, no order for sanctions has been entered, and the mere threat of impending sanctions is no reason for the Court to further suspend the disposition of this case or retain jurisdiction over state-law claims that should otherwise be dismissed.

Therefore, having dismissed Plaintiff's federal claims, and for the reasons stated in the above section, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.

## C. PRELIMINARY INJUNCTION

Plaintiff also seeks a preliminary injunction enjoining Defendants from "accessing, deleting, modifying, copying, or using the Stolen Hard Drive or SCG billing records," and compelling them to return the hard drive, billing records, and any information taken from the hard drive and requiring Defendants to "verify under oath that they have delivered all such documents and information as noted above, and have not retained any copies in any form or format."[69]

"Preliminary injunctions are extraordinary equitable remedies designed to 'preserve the relative positions of the parties until a trial on the merits can be held.'"[70] The party moving for preliminary injunctive relief bears the burden of establishing that: (1) it has a substantial likelihood of success on the merits of its claim; (2) it will suffer irreparable injury unless the injunction issues; (3) the threatened injury outweighs damage to the opposing party; and (4) the injunction would not be adverse to the public interest.[71] Plaintiff's Motion for preliminary injunction fails under the first element of this test since all of Plaintiff's federal claims are

---

[69] Docket No. 38, at 2.

[70] *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009) (quoting *Univ. of Tex. v. Camensich*, 451 U.S. 390, 395 (1981)).

[71] *See id.*

dismissed and the Court declines to exercise supplemental jurisdiction over the remaining state claims. Therefore, the Court denies Plaintiff's Motion for Preliminary Injunction without prejudice to it being filed in state court.

IV.    CONCLUSION

It is therefore

ORDERED that Defendants' Renewed Motion to Dismiss RICO Claims (Docket No. 47) is GRANTED. Plaintiff's RICO claims are dismissed with prejudice. It is further

ORDERED that Defendants' Conditional Motion for Retention of Supplemental Jurisdiction (Docket No. 55) is DENIED. The Court declines to extend supplemental jurisdiction over Plaintiff's state-law claims and dismisses them without prejudice. It is further

ORDERED that Plaintiff's Motion for Preliminary Injunction (Docket No. 36) is DENIED without prejudice.

DATED this 31st day of July, 2018.

BY THE COURT:

Judge Ted Stewart